UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ARTISAN/AMERICAN CORP., ALVIN MANOR, LTD., ALVIN MANOR ESTATES LTD., and INLAND GENERAL CONSTRUCTION CO.<br><br>Plaintiffs,<br><br>v.<br><br>THE CITY OF ALVIN,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§  CIVIL ACTION NO. 4:07-cv-2899<br>§<br>§<br>§<br>§ |

## MEMORANDUM AND ORDER

Pending before the Court is Defendant's Motion for Summary Judgment. (Doc. No. 18.) For the following reasons, Defendant's Motion must be granted.

## I. BACKGROUND

### A. Factual

This lawsuit arises from Defendant City of Alvin's refusal to grant a permit to allow the Plaintiffs, Artisan/American Corp., Alvin Manor, Ltd., Alvin Manor Estates, Ltd., and Inland Construction Co., to build a low-income housing apartment project in the City of Alvin. Plaintiff Artisan/American Corp. ("Artisan/American") formed the Alvin Manor Partnership to build two low-income housing tax-credit developments, collectively the Alvin Manor Development ("AMD"), on Highway 6 in the City of Alvin ("City"). (Doc. No. 1, ¶ 9.) Each of the two projects of the proposed AMD was designed for thirty-six residential rental units.

In January 2004, to secure funding for the AMD, Artisan/American applied to the Texas Department of Housing and Community Affairs ("TDHCA") for housing tax

1

credits. The City opposed the TDHCA application and submitted a resolution explaining that the City already had a greater proportion of citizens receiving housing assistance than other cities in Brazoria County, and the proposed development did not meet the City's building ordinances, although it did not specify which ordinance(s).[1] (Doc. No. 21, Ex. A-5.) Despite the City's opposition, the TDHCA approved the AMD applications in June 2004 and notified the City. (Doc. No. 21, Ex. A-7.)

In the period from August 2004 until August 2006, Artisan/American attempted to obtain the City's approval for a permit for the AMD. The two parties resolved all objections to the proposal, including other violations of the City's zoning ordinances, except for Section 31-7(e) of the Ordinances of the City of Alvin ("the Ordinance"). (Young Decl., Doc. No. 21, Ex. A, 3.) The Ordinance states:

> No Apartment Project shall be located nearer than three hundred (300) feet to a single family residential dwelling unless it is, also, located within three hundred (300) feet of another apartment project. The measurement of the distance between the apartment project and single family residential dwelling or other apartment project shall be in a direct line from the property line of the apartment project to the property line of the single family residential dwelling or other apartment project.

City of Alvin, Ordinance § 31-7(e).

On April 28, 2005, the City held its first pre-development meeting with Artisan/American. At the meeting, the City allegedly told Artisan/American's representative, engineer Sikander Agha, that the proposed location for the apartment complex would violate the Ordinance and provided Agha a copy of the Ordinance.

---

[1] In April 2005, the City passed other resolutions denying permits to two other low-income housing developments proposed by Artisan/American using the same language as in the denial of the AMD. (Doc. No. 21, Ex. A-12, A-13.) Artisan/American did not submit TDCHA applications for these projects. (Young Decl., Doc. No. 21, Ex. A, ¶ 22.)

2

(Holly-Lira Aff., Doc. No. 18, Ex. A, ¶ 8.) At this meeting, a city official took notes that read:

> SA: "What if we got a variance for the apartment project location?"
> City: "You can ask but there was a resolution on this site not to do it."

(Doc. No. 21, Ex. A-11.)

In subsequent meetings between the City and representatives of Artisan/American, on June 28, 2005, and January 3, 2006, the City reiterated its position that the proposed AMD violated the Ordinance, and Artisan/American did not ask for a variance. (Holly-Lira Aff., Doc. No. 18, Ex. A, ¶¶ 11-12, Ex. A-4.) In the second pre-development meeting on March 16, 2006, the City informed an Artisan/American representative, Gregg Cornett, that the preliminary plats of the AMD continued to violate the Ordinance. (Doc. No. 21, Ex. A-8.) At this meeting, Artisan/American addressed the City's objections by proposing to eliminate one of the two AMD projects and moved the other project further from a triplex.[2] The remaining AMD project used the front part of the property, on Highway 6, as retail development, with an access road through the middle of the development for tenants. (Young Decl., Doc. No. 21, ¶ 17.) The City explained that this new AMD proposal continued to violate regulations because it did not provide adequate access from the complex to a public street. (Holly-Lira Aff., Doc. No. 18, Ex. A, ¶ 13.) The street issue was discussed, but never resolved, via letters exchanged throughout the summer of 2006.[3] According to a map provided by the City on August 8,

---

[2] Artisan/American claims this triplex was not a family dwelling but was used as a business. (Young Decl., Doc. No. 21, ¶ 17.)

[3] Elizabeth Young, of Artisan/American, allegedly sent the City a letter on June 19, 2006, suggesting that the City accept as a public street a road that would serve only the apartment complex. (Holly-Lira Aff., Doc. No. 18, ¶ 14.) Holly-Lira responded in a letter dated July 12, 2006, that Section 21-37(c) of the City of Alvin Subdivision Ordinance requires all tracts of land to have access to the public street. (Doc. No. 21, Ex. A-8.) Holly-Lira further provided: "it would not be in the best interest of the city to accept the access street as a public street since it only serves the apartment project and would only create needless

2006, the AMD, including the access road, Alvin Manor Drive, is within 300 feet of the triplex, two lots on which single family homes are situated, and a mobile home park, in violation of the Ordinance. (Young Decl., Doc. No. 21, Ex. A, ¶¶ 19-20; Ex. A-10, at 3.)

On September 11, 2006, Artisan/American filed a lawsuit in state court in the 149th District Court of Brazoria County seeking an injunction to require the City to approve a building permit for the AMD. (Pl. Orig. Pet., Doc. No. 18, Ex. B.) The City still had not approved the project by February 2007, the TDCHA tax credits were set to expire on December 31, 2007, and Artisan/American knew it could not meet the December deadline; it therefore terminated the AMD.

### B. Procedural

Plaintiffs later amended their September 2006 petition for an injunction to allege damages claims under the state and federal fair housing acts. (Pl. Am. Pet., Doc. No. 18, Ex. C.) After the City removed the action and the District Court granted Plaintiffs' Motion to Remand, Artisan/American non-suited the claims.[4] (Doc. No. 18, Ex. H.) Plaintiffs then filed the instant lawsuit alleging violations of the state and federal fair housing acts. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

---

expenditures, with regards to maintenance, for the City." (Doc. No. 21, Ex. A-8.) On July 28, 2006, Young allegedly sent a letter with another preliminary plat. (Holly-Lira Aff., Doc. No. 18, Ex. A, ¶ 15.) Holly-Lira responded on August 8, 2006, noted several concerns with the drainage plan, and explained that Alvin Manor Drive should not be dedicated to the public because "it only serves the apartment project and is therefore a private driveway," thus the plat boundary includes Alvin Manor Drive and the AMD continued to violate the Ordinance. (Doc. No. 21, A-9.)

[4] During a hearing granting Plaintiffs' Motion to Remand, the court held that Artisan/American was to pay $5000 in removal costs if the case was ever again before the court because Artisan/American added claims under the Federal Fair Housing Act. *See Artisan/American Corp. v. City of Alvin*, C.A. No. G-07-033, 2007 WL 471001, *3 (S.D.Tex. Feb. 9, 2007). The Plaintiffs claims are now again before the Court.

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. F.R.C.P. 56(e)(1); *See, e.g., Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III. VIOLATIONS OF THE STATE AND FEDERAL FAIR HOUSING ACT

### A. FHA Standard

Plaintiff's allege that Defendant's conduct violated both the state and federal Fair Housing Acts ("FHA"). Both acts prohibit discrimination in the provision of housing. 42

U.S.C. § 3601 et seq.; TEX. PROP. CODE., ch. 301. The federal act makes it unlawful to "make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). The Texas Fair Housing Act prohibits the same acts with the same language. TEX. PROP. CODE. § 301.021.

These statutes apply to claims by developers for alleged discriminatory practices. Any "aggrieved person," defined as any person "who claims to have been injured by a discriminatory housing practice," is authorized to bring an action under the FHA to recover damages. See 42 U.S.C. § 613(a)(1)(A), (c); § 3602(i)(1). "Person" includes "one or more individuals, corporations, partnerships, associations...." See 42 U.S.C. § 3602(d). A "dwelling" includes vacant land offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof. See 42 U.S.C. § 3602(b).

Standing, for purposes of the FHA, extends to the constitutional limits of Article III. See *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982). To satisfy the Article III standing requirement, a party must meet a three-pronged test: (1) a plaintiff must demonstrate that it has suffered a concrete, particularized, actual or imminent injury in fact (2) fairly traceable to the challenged actions of the defendant (3) redressable by a favorable decision of the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In early FHA decisions, the Supreme Court noted that a developer does not have a racial classification, and therefore, cannot be a direct target of a city's allegedly discriminatory zoning practices. See *Village of Arlington Heights v. Metropolitan Housing Authority*, 429 U.S. 252, 263-64 (1977). In *Arlington Heights*, however, the Supreme Court did not reach the question of the developer's standing because the suit

included an individual plaintiff who would have moved to the development had it been built. *Id.* at 563. Other circuits have more recently interpreted the FHA to allow broad assertions of standing such that developers can redress their economic injuries incurred because of discriminatory practices that violate the FHA. *See Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1100 (3rd Cir. 1996); *Growth Horizons, Inc. v. Delaware County, Pennsylvania*, 983 F.2d 1277, 1282 n. 6 (3d Cir.1993) (citing *Havens Realty*, 455 U.S. at 475-76); *Baytree of Inverrary Realty Partners v. City of Lauderhill*, 873 F.2d 1407, 1408-1409 (11th Cir. 1989); *Hallmark Developers, Inc. v. Fulton County, Georgia*, 386 F.Supp.2d 1369, 1381 (N.D. Ga. 2005), *aff'd* 466 F.3d 1276 (11th Cir. 2006), *Eastampton Center, L.L.C. v. Township of Eastampton*, 155 F.Supp.2d 102, 114 (D.N.J. 2001); *c.f. Nasser v. City of Homewood*, 671 F.2d 432, 437-438 (11th Cir. 1982) (holding plaintiffs did not have standing where they alleged an economic injury but had no plans to build a housing development for minority or even low or medium-income tenants). Although the Fifth Circuit has not spoken to the issue, the Court finds the above-cited cases persuasive and finds that Plaintiffs have standing to pursue their claims under the FHA. A favorable decision in this case would remedy the economic damages allegedly caused by the actions of the City because of its purported discriminatory actions. *See also Luckett v. Town of Bentonia*, C.A. No. 5:05-cv-144, 2007 WL 1673570, *4 (S.D.Miss. June 7, 2007); *Dews v. Town of Sunnyvale, Tex.*, 109 F.Supp.2d 526, 562 (N.D. Tex. 2000).

In order to allege a claim under the FHA, a plaintiff may establish either proof of discriminatory intent or a significant discriminatory effect. *See, e.g., Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996); *Hanson v. Veterans Administration*,

7

800 F.2d 1381, 1386 (5th Cir. 1986). A discriminatory impact may be proven by showing either (1) "adverse impact on a particular minority group" or (2) "harm to the community in general by perpetuation of segregation" *Dews*, 109 F.Supp.2d 526 at 531 (citing *Huntington Branch NAACP v. Town of Huntington*, 844 F.2d 926, 937 (2nd Cir.), *aff'd*, 488 U.S. 15 (1988) (affirming but not approving a particular disparate impact test)). The Fifth Circuit analyzes disparate impact for purposes of the FHA by analogy to a Title VII discrimination claim.[5] *See Simms*, 83 F.3d at 1556. That is, a plaintiff must establish that, taken as a whole, the circumstantial evidence provided creates a reasonable inference that race was a significant factor in the defendant's decision. *Id.* The ultimate relevant question is whether the acts have "a significantly greater discriminatory impact" on members of the protected class. *See Simms*, 83 F.3d at 1555 (citing *Anderson V. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1284 (5th Cir. 1994), *cert. denied*, 513 U.S. 1149 (1995)). That is, the court must find that race played some role in the real estate transaction. *See Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986); *Moore v. Townsend*, 525 F.2d 482 (7th Cir. 1985). In light of *Simms*, the Court will examine the disparate effect of the City's actions, and if one exists, whether the City's actions

---

[5] In drawing its analogy to Title VII cases, *Simms* relies on a later-abrogated case. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-48 (2000) (abrogating *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989 (1996)). This reliance, however, is not fatal to the analysis. The Fifth Circuit is joined by many sister circuits in using the *McDonnell Douglas* burden-shifting analysis to evaluate disparate treatment claims. *See, e.g., 2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 680 (D.C. Cir. 2006); *Langlois v. Abington Housing Authority*, 207 F.3d 43, 51 (1st Cir. 2000); *Hack v. President and Fellows of Yale College*, 237 F.3d 81, 98 (2d Cir. 2000), *abrogated on other grounds, Graoch Associates # 33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n*, 508 F.3d 366, 377 (6th Cir. 2007); *Darst-Webbe Tenant Ass'n Bd. v. St. Louis Housing Authority*, 417 F.3d 898, 901 (8th Cir. 2005); *Budnick v. Town of Carefree*, 518 F.3d 1109, 1114 (9th Cir. 2008) (explaining that both the *McDonnell Douglas* test or "direct and circumstantial evidence sufficient to demonstrate that a discriminatory reason more likely than not" motivated the decision may establish a violation of the FHA); *Mountain Side Mobile Estates Partnership v. Secretary of Housing and Urban Development*, 56 F.3d 1243, 1251 n.7 (10th Cir. 1995). *See also, Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977) (holding that a practice that establishes a disparate impact may violate the FHA).

8

were pretext—that is, more likely than not motivated by racial animus rather than Plaintiffs' non-compliance with the Ordinance.

**B. Analysis**

### 1. Intentional discrimination

The City argues that there is no evidence of discriminatory intent because the Ordinance is content neutral and permissibly encourages separation of single-family homes from multi-family residential developments. In addition, it contends there is no evidence that the City enforced the Ordinance in a discriminatory fashion. Plaintiffs concede that separation of single family homes from multi-family developments is a legitimate objective. (Doc. No. 21, at 10.) They respond, however, that the City's opposition to the AMD was pretext for race-based discrimination against people of Hispanic or Latino descent. First, they note that the City passed its resolution opposing tax credits for the development only two months after the City was notified of the proposed project, and the City later opposed credits for Plaintiffs' two other proposed developments. Second, Plaintiffs argue that the Ordinance was unreasonably applied because the City determined that the access road was part of the AMD, and because it considered the structures in the adjacent mobile home park single family dwellings. Third, Plaintiffs allege that city officials made discriminatory remarks concerning the proposal.

A city may control land use by zoning ordinances. *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926). A land use ordinance, however, motivated by a desire to exclude minorities or with a disparate effect on minority housing constitutes an FHA violation. *See Dews v. Town of Sunnyvale, Tex.*, 109 F.Supp.2d 526, 530 (N.D. Tex.

9

2000); *United States v. City of Parma*, 494 F.Supp. 1049, *aff'd* 661 F.2d 562 (6th Cir.1981) (holding that numerous actions by city provided evidence of housing discrimination, including wholesale rejection of public and low-income housing, that violated the FHA).

Even if Plaintiffs' above-mentioned evidence does not constitute discriminatory intent, it may support a claim of discriminatory impact if the regulations were disparately applied. In *Parma*, for example, the city rejected the proposed housing project outright rather than attempting to remedy any problems with the proposed plans, a departure from the lenient enforcement of the regulations and procedures for other projects. *See Parma*, 494 F.Supp. at 1074-76, 1084. In addition, the court found that several ordinances combined to prevent all low income housing in the town, also in violation of the FHA. *See Id.* at 1087-90, 98. Even though the individual ordinances were not all enacted with a racially discriminatory purpose, the court found that they violated the FHA because of the segregative effect of banning low income housing, and the lack of legitimate purpose behind the ordinances. *See Id.* at 1100 n. 69.

### a. Timing of the first resolution

On March 4, 2004, the City adopted a resolution declining to support the AMD's application for TDHCA tax credits. (Doc. No. 21, Ex. A-5.) Plaintiffs contend that the resolution was evidence of the City's discriminatory intent to reject the project. Plaintiffs note that, at the time of the resolution, the City had not yet received a plat or construction plan, did not request marketing studies, and TDHCA had not approved the project. (Young Decl., Doc. No. 21, Ex. A, ¶¶ 8-9.) The City explained in its resolution that the proposed project "does not meet the City's building ordinances," and "one-third of all the

'low fixed income' residents in Brazoria County that utilize housing vouchers currently reside in Alvin ... in comparison with all the other cities in Brazoria County, the City currently has a higher percentage of citizens receiving housing assistance." (Doc. No. 21, Ex. A-5.) In addition, the City noted that "a new apartment complex with similar rental assistance programs recently opened for occupancy in late 2003." *Id.* None of these statements suggests an intent to discriminate on the basis of race.

Further, none of the words or deeds provides circumstantial evidence of discriminatory treatment or impact. Plaintiffs have provided no evidence that the developer's tax application was treated any differently, or addressed more quickly, than other projects submitted to the TDHCA. *See, e.g., Arlington Heights*, 429 U.S. at 267; *Parma*, 494 F.Supp. at 1074-76. They do not present any evidence to suggest that a marketing study is normally prepared prior to a resolution supporting or opposing a project's TDHCA application. *See, e.g., Jim Sowell Const. Co., Inc. v. City of Coppell, Texas*, 61 F.Supp.2d 542, 549 (N.D.Tex. 1999). In addition, they provide no evidence that the City's opposition of the tax credits affected its consideration of the Plaintiffs' permits. They identify no comments surrounding the resolution that suggest a discriminatory intent motivated the resolution. The timing of the resolution, without more, does not suggest a discriminatory animus influenced the rejection of Plaintiffs' permit.[6]

---

[6] The City notes that Plaintiffs did not challenge the City's decision to oppose Plaintiffs' tax credit application. The City claims that had Plaintiffs done so, their challenge would have been barred under the *Noerr-Pennington* doctrine as the City was petitioning a government agency. The Court need not reach this argument because Plaintiffs did not specifically challenge the resolution as violating the FHA.

11

### b. Unreasonable Application of the Ordinance

Plaintiffs claim that the City's interpretation of its ordinances regarding the access road and the status of the mobile home parks was unreasonable and provides evidence of discriminatory intent. Specifically, they argue that there were no single family dwellings within three hundred feet of the proposed development because the only structures nearby were in a "dilapidated mobile home park." They claim that to classify the park as residences is "not compelled by the language of the ordinance." (Doc. No. 21, at 11-12.) Plaintiffs claim that the City's Ordinances define "manufactured home park" as an area with structures that are "transportable in one or more sections." (Doc. No. 21, at 11, citing Alvin Code of Ordinances § 24½-4.) In contrast, Plaintiffs note that for purposes of another Chapter, single family dwellings are defined as "a house or any other site built building used for single family residential purposes," and argue that this definition cannot apply to a park that rents spaces for manufactured homes. (Doc. No. 21, at 12, citing Code § 34-1.)

The City responds that the Code also specifies that a "single family dwelling" is a dwelling "to be occupied by one family," Code § 24½-89, but claims that neither definition applies to the Ordinance. (Doc. No. 21, at 3 n. 3.) The Ordinance is in Chapter 31 of the Code, and the Chapter provides no definition of "single family residential dwelling," although it does have a definitions section. City of Alvin, Code of Ordinances, § 31-1, *available at* http://www.municode.com/.

Without further guidance from a definition within the Ordinance's Code Chapter, or any evidence from Plaintiffs that this interpretation conflicts with the clear language of the Code as interpreted for other projects, the City's decision does not seem unreasonable

or arbitrary. Plaintiffs omit the final sentences of the definition of "mobile home," that these structures are "designed to be used as a dwelling." Code § 24½-4. In a Code section that requires the location of public storage facilities to be located more than 500 feet from a "single family dwelling," the term is defined as "a house or any other site built building used for single-family residential purpose(s)" Code § 34-1. Or, in the City's Fair Housing Chapter, housing accommodation is defined to include any building, mobile home, or trailer structure. Code § 12½-17. On the other hand, the Code classifies land uses into several categories and distinguishes "detached single and attached single and two (2) family dwellings up to a maximum density of four (4.0) units per acre" (intensity category II) from "manufactured home parks," (III), from "multiple family developments," (IV) and "multi-tenant buildings" (V). Code § 35-44. Plaintiffs have provided no evidence that these definitions were applied differently to other projects sufficient to raise an inference, let alone provide direct evidence, that the City's denial of a permit was motivated by discrimination against people of Hispanic or Latino descent.

Similarly, Plaintiffs argue that the inclusion of the access road in the development was not compelled by the Ordinance. Again, the Code does not clearly define the boundaries of an "apartment project." Code § 31-1. Again, Plaintiffs have provided no evidence that the City's interpretation was contrary to established practice or different than that used to approve other projects.

Plaintiffs' evidence of a purported "arbitrary and unreasonable" application of these sections of the Code, without evidence that other projects were treated differently at the time of the rejection, is insufficient for a reasonable jury to infer that race motivated the decision to deny the permit. *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1558 (5th

Cir. 1996) (citing *Arlington Heights* to support its holding that where plaintiff has not established that others were treated differently, he cannot create an inference of racial bias). The Plaintiffs do not demonstrate that the City dramatically changed its interpretation of its ordinances or enacted new ordinances specifically designed to bar this project where it treated others more leniently. *See, e.g., Jim Sowell Const. Co., Inc. v. City of Coppell, Texas*, 61 F.Supp.2d at 548 (holding that jury could not infer racial animus, where city enacted ordinance six days after low income housing project permit application was submitted, because plaintiffs had provided no evidence that the ordinance was motivated by the application).

### c. Discriminatory remarks

Where a significant bloc of the decision makers acted because of discriminatory motives, even if they do not constitute a majority of the governing body, and there are circumstances suggesting the probable complicity of others, discriminatory remarks are evidence of discriminatory intent. *Esperanza Peace and Justice Center v. City of San Antonio*, 316 F.Supp.2d 433, 452 (W.D.Tex. 2001) (applying cases in the FHA context and adopting the reasoning of *Scott-Harris v. City of Fall River*, 134 F.3d 427, 438 (1st Cir. 1997), *overruled on other grounds by Bogan v. Scott-Harris*, 523 U.S. 44 (1998) (holding that the individual city officials had legislative immunity)). On the other hand, an isolated comment by one decision-maker on a multi-member board or a comment from a member of the community to such a decision-maker, without more, does not support a finding of discriminatory intent. *Hallmark Developers, Inc. v. Fulton County, Ga.*, 466 F.3d 1276, 1284 (11th Cir. 2006).

Plaintiffs argue that Dick Tyson, a member of the Alvin City Counsel was present when one City Council member made a comment that could have been interpreted to indicate anti-Hispanic sentiment in relation to the AMD. (Young Decl., Doc. No. 21, Ex. A, ¶ 24.) The Plaintiffs admit that they have been unable to find disinterested witnesses willing to testify or provide affidavits confirming the existence of such remarks and have, as yet, provided no supplemental evidence. (Doc. No. 21, at 12 n. 4.)

### 2. Disparate impact

The City argues that Plaintiffs have not proven that the City has a policy or practice of preventing the construction of apartments within the City. Further, the City argues that the Ordinance in fact encourages the development of apartments: the areas available for construction of new apartments will expand over time because the Ordinance requires a 300 foot separation from single family houses unless the proposed development is also located within 300 feet of another apartment project. Plaintiffs contend that the loss of the AMD project has a significant discriminatory impact on racial minorities, specifically people of Hispanic/Latino descent. Plaintiffs reason that, because a higher percentage of racial minorities rent rather than own homes and a higher percentage of racial minorities qualify for low-income housing, any denial of a low-income housing project will have a significant discriminatory effect on the City's Hispanic residents.

#### a. Harm to a particular minority group

Courts analyze disparate impact by looking at the percentage of minorities affected by the decision compared with the percentage of non-minorities. *See Huntington*, 844 F.2d at 938 (analogizing to the Supreme Court's use of proportional statistics rather

15

than absolute numbers in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971)); *Dews v. Town of Sunnyvale, Tex.*, 109 F.Supp.2d at 565 (holding that town's policies banning apartments disparately affected African-Americans because fewer than 15 percent of the households in the county were African-Americans, but African-Americans occupied 50 percent of the households in assisted rental housing). In analyzing the disparate impact, the relevant percentages affected are derived by calculating the racial composition of those households and individuals who meet the income parameters for the proposed development and are the likely applicants to live in the project. *Summerchase Ltd. Partnership I v. City of Gonzales*, 970 F.Supp. 522, 530 (M.D.La. 1997) (relying on the analysis in *Ward's Cove Packing v. Antonio*, 490 U.S. 642 (1989), *overruled on other grounds*, Civil Rights Act of 1991, Pub. L. 102-166 § 105); *Hallmark Developers, Inc.*, 466 F.3d at 1286-87.

A court may find an adverse impact, where, for example, a plaintiff alleged that the county's policy caused the exclusion of public housing from the unincorporated five-mile area, and this exclusion allegedly affected African-Americans disparately because they constituted over 86 percent of the people on the waiting list for the proposed new public housing project. *See Jackson v. Okaloosa County, Florida*, 21 F.3d 1531, 1543 (11th Cir. 1994). In another case, plaintiffs established a prima facie case for disparate impact where 7 percent of all families in the city needed subsidized housing in 1982-1985, while 24 percent of the black families needed such housing and about 60 percent of the people with, or on the waiting list for, Section 8 vouchers, were minorities. *Huntington*, 844 F.2d at 938.

In *Summerchase*, the court analyzed the racial composition of the likely residents of the proposed development and concluded that, because the residents who fell within the relevant income bracket were nearly 80 percent non-minority, minorities were not disparately impacted when the project was not constructed. *See Summerchase*, 970 F.Supp. at 530. In addition, small differences in the impact on non-minority and minority households do not support a finding of disparate impact. *See Hallmark Developers*, 386 F.Supp.2d at 1380, 1383 (holding that plaintiffs failed to establish a disparate impact claim where the difference between the impact on non-minority and minority homeowners/renters was only four percent, the disparate impact analysis failed to take into account the significant available of other housing choices in the area, and most of the conclusions of the analysis were speculative because the ultimate rental cost of the apartment units at issue was unknown).

The AMD was intended to provide 80 percent of its units for restricted income housing. (Doc. No. 21, Ex. A-1.) The allowed income range for those restricted units was $12,850 to $48,540 depending on the size of the family. *Id.* Plaintiffs do not provide any analysis of the racial make-up of the relevant income pool who might have occupied the AMD's thirty-six units.[7] Here, the City has presented unrefuted evidence that there are many other sites on which apartments may be constructed within the city, including sites next to the proposed AMD site. (Doc. No. 18, Ex. A-9.) In addition, most of the low-

---

[7] Plaintiffs' expert has presented evidence that the City has 2,452 rental housing units. (Doc. No. 21, Ex. B, ¶ 3.) Regardless of income, minorities rent at a higher rate than non-minorities: 23.8 percent of the households in the City are minorities, but minorities constitute 40 percent of the rental households. *Id.* The overall rental rate in the City is 45.2 percent; white households, 43.1 percent; Hispanic/Latino households, 51.5 percent; and African-American households, 66.2 percent. (Doc. No. 21, Ex. B, ¶ 4.) In addition, the median Black income is $19,205; Hispanic/Latino, $32,393; overall median household income of $38,576. (Doc. No. 21, Ex. B, ¶ 5.) This evidence suggests that members of all racial groups would qualify to live in the AMD and does not suggest that the addition or subtraction of 36 units of rental housing (1.5 percent of the existing apartment stock) would have an affect on the housing choices for any of the City's residents.

income housing in Brazoria County is located in the City suggesting that there is no shortage. (Doc. No. 21, Ex. A-5.)

In this respect, this case is distinguishable from the majority of cases in which disparate impact was found. In those cases, invariably there was a waiting list for affordable housing or a shortage of housing for which only a defined group qualified. *See Hallmark Developers, Inc. v. Fulton County, Ga.*, 466 F.3d at 1287 (citing cases). Plaintiffs have presented no evidence that there is a shortage of low-income housing, or that anyone waiting for low-income housing was affected by the denial of the permit sufficient to raise an issue of material fact of disparate impact.

### b. Harm to the community because of racial segregation

Plaintiffs may also establish disparate impact by demonstrating that the policies at issue encourage segregated housing. Courts examine the location of minorities in the community to establish whether challenged decision or policy encourages patterns of segregated living. *See Huntington*, 844 F.2d at 937-38 (holding that a zoning practice impermissibly encourages segregation if it limits all private, multi-family dwellings to an area of town with a high minority concentration in a town with a shortage of rental housing for low and moderate-income households); *Dews*, 109 F.Supp.2d at 567-68 (holding that plaintiffs had established a disparate impact claim where the surrounding counties had higher concentrations of African-American households than Sunnyvale such that one could infer that its zoning policies discouraged African-Americans from moving to Sunnyvale). Plaintiffs have provided no evidence that minorities live in particular areas of town or that this apartment would exacerbate such a trend, if it existed.

### c. Inference of discrimination

Even if Plaintiffs could establish a disparate effect on minorities likely to apply for the project, they have not met their burden of producing evidence sufficient to allow a reasonable jury to conclude that discrimination motivated the City's denial of the permit. Plaintiffs have not established that they were treated differently from any other applicant for an apartment project to create an issue of material fact as to discriminatory motive. They have provided no relevant evidence of discriminatory comments made by the relevant decision-makers, or other evidence sufficient to allow an inference that race motivated the decision to deny the permit to the AMD on its proposed site.

The Defendant notes, and the Plaintiffs do not dispute, that the City has a large Hispanic population (up to 45 percent of the population), and it has a history of electing Hispanic members to its governing body. In fact, the Mayor at the time the Ordinance was adopted is Mexican-American. Further, two of the five members of the City's Engineering Department, responsible for making the decision to deny the Plaintiffs' permit, are Mexican-American; and Holly-Lira is married to a Mexican-American man. (Holly-Lira Aff., Doc. No. 18, Ex. A, ¶ 18.) Plaintiffs have not established an FHA claim for purposes of the federal or state statute.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion is **GRANTED**.

**IT IS SO ORDERED.**

SIGNED this 19th day of November, 2008.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS
ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND
AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT
ONE BY THE COURT